**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LISA A. LEHMAN,**

      **Plaintiff,**

                                **Civil Action 2:11-cv-488**
      **v.**                         **Judge Peter C. Economus**
                                  **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**<u>REPORT AND RECOMMENDATION</u>**

Plaintiff, Lisa A. Lehman, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits and supplemental security income.  This matter is before the United State Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 13), and the administrative record (ECF No. 8).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's finding of nondisability.

## I.    BACKGROUND

Plaintiff protectively filed her applications for benefits on March 6, 2007, alleging that she has been disabled since March 1, 2006, at age forty-two.  Plaintiff alleges disability as a result of manic depression, bipolar, short-term memory loss, shingles, reading and writing problems, kidney problems, and back pain.  (R. at 225.)  Plaintiff's applications were denied

initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Thomas R. McNichols, II ("ALJ"), held a hearing on March 15, 2010, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 33-58.)  A vocational expert also appeared and testified.  (R. at 58-64.)  On March 23, 2010, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. at 10-22.)  The ALJ's decision became final and appealable on April 5, 2011, when the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff was forty-six years old at the time of the administrative hearing.  (R. at 33.)  She testified that she lived at home with her son, her boyfriend, and her boyfriend's daughter.  (R. at 34.)  In terms of income, Plaintiff receives food stamps, a medical card, and some child support payments.  (R. at 36.)  She stopped going to school between the fifth and sixth grade, where she was in special education classes.  (R. at 36-37.)  She testified that she could read "very little" and could only write her name.  (*Id.*)  She represented that she could not read the forms the Social Security Administration sent her and that other people filled out her work application forms for her.  (R. at 36, 53.)  She testified that "it's just a struggle every day."  (R. at 57.)

Plaintiff testified that she had been disabled all of her life.  (R. at 38.)  She was unsure why her alleged disability onset date was March 1, 2006, as nothing significant had happened on that day.  (*Id.*)  She said that she had a panic disorder all the time and crying spells "sometimes every day."  (R. at 42-43.)  She indicated that her medication helped, but made her feel tired.  (R.

at 44-45.)  She also complained of memory loss.  (R. at 44-45.)  Plaintiff testified that her panic attacks affect her ability to work because she cannot deal with stress.  (R. at 42-43.)  Plaintiff testified that she was going to counseling but that she stopped when she received her diagnosis. (R. at 43.)  She added that she stopped going to counseling because she no longer wanted to go. (R. at 44.)  Plaintiff could not recollect any recent hospitalizations for psychiatric reasons.  (R. at 45.)  Upon questioning from her counsel, Plaintiff indicated that she experiences "highs and lows."  (R. at 56.)  During a "high" period, she has a lot of energy and may try to do the laundry or "pick up stuff" around the house.  (*Id.*)  During a "low," she may stay in bed for weeks or just stay in her room.  (*Id.*)  Plaintiff further testified that her shingles causes back pain which prevents her from walking more than a block or from standing more than five to ten minutes.  (R. at 45-47.)  She added that she could not lift more than a gallon of milk and that she did not know if she could climb stairs.  (R. at 48.)

Plaintiff testified that she had tried to apply for Social Security numerous times, but had been denied.  (R. at 53.)  Her last hearing was in September 2001.  (*Id.*)  After denial, Plaintiff returned to work, working through 2005 as gas station cashier.  (*Id.*)  She testified that she was able to work at her last job as a gas station cashier because the supervisor knew her and "covered" for her.  (R. at 39.)  She also testified that she was able to perform her cashier job with the assistance of the cash register and because she was able to train herself to count change.  (R. at 55.)  She first represented that she stopped working due to stress and after contracting shingles.  (R. at 39.)  Later, she testified that she quit that job because she was unable to learn the job and also because she got shingles.  (R. at 53.)  She felt that she could not return to work because she would break out in shingles again.  (R. at 40.)  She later indicated, however, that she

3

did not quit her job, but was fired for falsifying her job application.  (R. at 53.)  She then testified that she could not go back to work because she cannot stand to be around people.  (R. at 48-49.)

Plaintiff testified that she has a driver's license, but she drives just once or twice a week.  (R. at 35.)  She reported that she gets "lost a lot," so she does not go out of town.  (*Id.*)  She testified that she had trouble taking the test to obtain her driver's license, so she had a look-a-like friend take the test for her.  (R. at 36.)  As to other activities of daily living, Plaintiff testified that she arose between ten or eleven a.m., sat around the house, and listened to the radio or watched television.  (R. at 52.)  She represented that she did not lift anything and did not do any type of housework.  (R. at 48.)  More specifically, she represented that she did not go to the grocery store, cook, wash dishes, sweep, mop, vacuum, do laundry, or shop.  (R. at 48-49.)  Plaintiff indicated that her boyfriend and children do everything.  She reported that she does not go to church and only has one friend who visits her.  (R. at 49.)  Plaintiff testified that she has no hobbies, does not participate in sports, does not take trips, and does not do any yard work or gardening.  (R. at 50.)  She denied any difficulty feeding, dressing, or grooming herself.  (R. at 52.)

Plaintiff testified that she quit drinking alcohol "[a] long time ago," noting she was not sure when she stopped drinking.  (R. at 50.)  She admitted to continued use of marijuana when she was stressed and to improve her appetite.  (R. at 50-52.)  She denied ever being arrested on alcohol- or drug-related charges, but indicated that she had received several misdemeanor convictions for hitting people.  (R. at 51.)  She said that she hit her boss on a housekeeping job.  (R. at 54.)

4

**B.** **The Vocational Expert's Testimony**

The ALJ first asked the vocational expert ("VE"), Charlotta Ewers, to consider a person who was mentally limited to performing jobs involving no requirement to follow complex or detailed instructions, no requirement to maintain concentration on a single task for longer for than fifteen minutes at a time, and a restriction to simple one or two-step tasks requiring little if any concentration.  (R. at 60-61.)  Based on this hypothetical, the VE testified that the individual could perform medium jobs, such as a store laborer, hand packager, and order filler with 20,000 jobs.  (R. at 61.)  The VE also testified to 30,000 light jobs that the individual could perform such as a laundry folder, small parts assembler, or machine taker.  (*Id.*)  Sedentary jobs the hypothetical individual could perform included bench assembler, surveillance system monitor, and lens inserter, with approximately 6,000 jobs.  (*Id.*)

If that same hypothetical individual was additionally limited to no direct dealing with the general public, the medium and sedentary jobs would remain.  (R. at 61-62.)  The VE testified that the added limitation would diminish the number of light jobs to 22,000.  (R. at 61.)  Adding the limitation of low stress jobs would erode the medium level jobs to 12,000; light jobs to 10,000; and sedentary jobs to 3,500.  (R. at 62.)  When additionally limiting the hypothetical individual to limited contact with co-workers and supervisors and no team work, the VE opined that there would still be jobs available at all exertional levels.  (*Id.*)  The ALJ further added the limitation of no reading above the second or third grade level. (*Id.*)  The VE testified that with this additional limitation, 8,000 jobs at the medium level remain, 5,000 at the light level, but none at the sedentary level.  (R. at 62-63.)

5

Finally, the VE opined that the hypothetical individual could not perform Plaintiff's past relevant work, that she did not have any transferrable skills, and that she identified no conflict with the Dictionary of Occupational Titles.  (R. at 63.)

### III.    MEDICAL RECORDS[1]

**A.    Mental Health Services for Clark County, Inc.**

Plaintiff was seen for an abbreviated assessment at Mental Health Services for Clark County, Inc. ("MHSCC") in September 1999 on a self-referral. (R. at 293-94.)  Plaintiff was not requesting treatment at that time, but was seeking out resources to help her with her social security claim.  (*Id.* (noting that Plaintiff came in "talking about forms she had received from Social Security" and that she "came in . . . primarily about her being turned down for disability").)  Plaintiff reported living with her boyfriend and "doing rather well."  (R. at 293.)  Walter Foltys, a psychological assistant, noted he had initially evaluated Plaintiff in October 1998 and had established diagnoses of learning disorder and amnestic disorder at that time.  He based October 1998 diagnoses and findings of evidence of developmental issues in paucity of language and learning difficulties upon Plaintiff's Wechsler Memory Quotient, which was found to be 59 and her standard scores for reading, spelling, and arithmetic, which were also found to be in the 50s.  (*Id.*)  Mr. Foltys noted that Plaintiff "does appear to be future oriented enough to be able to . . . seek out resources to help her with her Social Security Claim."  (*Id.*)  He again

---

[1]The undersigned recognizes that Plaintiff alleges disability in part because of her physical impairments.  The medical records indicate that Plaintiff has received treatment for various physical conditions, including back problems, shingles, and neuralgia.  The ALJ assigned exertional limitations due to these conditions.  Plaintiff does not challenge the Commissioner's findings with respect to her alleged physical impairments.  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's mental impairments and limitations.

diagnosed Plaintiff with a learning disorder and an amnestic disorder, assigning her a Global Assessment of Functioning ("GAF") score of 48.[2]  (R. at 294.)

Approximately five months later, in February 2000, Plaintiff returned to MHSCC, "to facilitate her application for Social Security."  (R. at 295-96.)  Mr. Foltys performed an abbreviated assessment because although she was scheduled for further appointments, she came only to her initial session.  (R. at 295.)  Plaintiff's chief complaint, again, appeared to be ongoing mild depression.  (*Id*.)  Her family doctor had prescribed Prozac to treat the mild depression.  (*Id*.)  Plaintiff reported no other major medical problems.  (*Id*.)  Mr. Folty noted that although Plaintiff denied smoking marijuana at her initial assessment, she acknowledged during this session that she was currently using the drug.  (*Id*.)  He also noted that her memory appeared to be poor, especially in immediate recall.  (R. at 296.)  Mr. Foltys' diagnoses included cognitive disorder, NOS, learning disorder, NOS, and dysthymia.  (*Id.*)

In July 2000, approximately five months later, Plaintiff self-referred herself for another psychological assessment with Mr. Foltys.  (R. at 534-35.)  He noted that Plaintiff's primary complaint has been that she "has been applying for Social Security Disability and [kept] getting turned down." (R. at 534.)  Mr. Foltys described Plaintiff as "cooperative, verbal, and friendly." (*Id*.)  During this visit, Mr. Foltys noted that Plaintiff appeared to exhibit severe memory difficulties, especially in matters of immediate recall.  (*Id*.)  By way of example, Mr. Foltys

_____

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  A GAF score of 41 - 50 is indicative of "serious symptoms . . . or serious impairment in occupational, social, or school functioning."  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

noted that Plaintiff "was unable to remember a single fact from a small short story after it was read to her.  Lisa had a difficult time remembering more than four digits forward."  He also noted that on this visit, her "remote memory seemed extremely impaired and she again, proved to be an extremely poor historian."  (*Id.*)  He explained that Plaintiff did not know how old she was, the birth dates of her children, or how long she had been divorced.  (*Id.*)  Mr. Foltys further noted that Plaintiff exhibited poor higher executive functioning, abstract reasoning, especially in areas of similarities and differences.  (R. at 534.)  He indicated that she had the most difficulty in immediate recall and in concentration, noting that she "could not do serial threes, nor could she count backwards from 20 to 1 in the appropriate time limit without skipping at least two of the numbers."  (R. at 535.)  Mr. Foltys once again diagnosed Plaintiff with a learning disorder and an amnestic disorder.  (*Id.*)  Mr. Foltys opined that Plaintiff continued to remain disabled due to possible neurocognitive and learning deficits.  (*Id.*)

The record also contains a partial assessment from December 5, 2003, when Plaintiff was examined by Diana Padrutt, LISW.  (R. at 533.)  She was referred by her primary care provider, Dr. Lin, to determine whether or not she is bipolar.  Plaintiff reported that she is usually pretty anxious, that she did not want to be around people, and that she was sometimes tired and took naps in the afternoon.  She noted that she has some problems with her anger and that she had a history of some assaultive behavior which included getting fired for hitting her boss.  She reported that she "blows up at her son when she is trying to get him out of bed" and that "she is trying to do everything for everyone."  (*Id.*)  Ms. Padrutt noted that Plaitniff appeared to use anger as a defense mechanism."  (*Id.*)  Plaintiff indicated that she was not currently depressed and that her last episode of depression occurred five or six years prior, in 1997 or 1998.  Ms.

8

Padrutt reported that Plaintiff conveyed that "she need[ed] to have an accurate diagnosis of bipolar and she wants to apply for disability."  (R. at 533.)

In June 4, 2007, Plaintiff once again referred herself to Mental Health Services for Clark County, Inc. for psychosocial assessment because she was applying for disability.  (R. at 394-98.)  Mark Schweikert, LICDC, performed a psychosocial assessment.  During this visit, Plaintiff reported anger control issues, racing thoughts, trouble sleeping, and poor concentration.  (R. at 394.)  Plaintiff stated that she smoked marijuana "on a daily basis" and smoked up to two packs of cigarettes everyday.  (R. at 397.)  She indicated that she had "basically quit drinking" and that she last drank alcohol three weeks prior to the assessment.  (R. at 397.)  She indicated that she "has an active social life" and that she played Bingo on a weekly basis.  (R. at 394.)  Mr. Schweikert reported that her family's perception of Plaintiff's needs "is that she needs to quit being so mean and to improve completion of household chores."  (*Id*.)  Mr. Schweikert opined that she was "at low risk for self-harm or harm to others."  (*Id*.)  Plaintiff acknowledged that she did not follow through with treatment recommendations Mr. Foltys had previously offered.  (*Id*.)  She denied having any "physical motor skills issues," denied experiencing any pain, and denied being hospitalized in the past five years.  (R. at 394-95.)  Mr. Schwikert noted that Plaintiff receives food stamps and was "aware of all available resources to her and needs no help in accessing them."  (R. at 396.)  Mr. Schwikert reported that Plaintiff's attitude "was positive and her behavior was focused throughout the clinicial interview"; "[h]er memory was intact for immediate, recent, and remote periods"; "[h]er speech and motor activity were within normal ranges"; her "[t]hought processes were clear"; and "[h]er insight into her problems was adequate."  (R. at 397.)  He opined that Plaintiff's recreational and leisure activities were

adequate.  (*Id*.)  Mr. Schweikert diagnosed Plaintiff with bipolar disorder and recommended continued treatment.  (R. at 398.)

That same day, Mr. Schweikert completed a Mental Functional Capacity Assessment and indicated that Plaintiff had moderate and marked mental limitations that made her "unemployable" for 12 months or more.  (R. at  392-93.)  He also noted that he based his opinion, in part, on her "lower level of reading," which he opined would make it "difficult to place her in a job."  (R. at 393.)

On June 9, 2007, Plaintiff underwent an educational-learning assessment which indicated that she had completed the 6th grade, that she was able to read and write, she could understand and follow directions, she was motivated to learn, and that she had no physical limitations on learning.  (R. at 590.)

Treatment notes though April 2008 show Plaintiff was seen for bipolar stability and mood issues.  Her attendance was sporadic, but notes indicate that her emotional state generally was improved and stable with treatment, her thought processes were consistently "clear," and she was oriented and focused.  (R. at 465-78, 480-83.)  In October 2007, Plaintiff's diagnosis was changed from Bipolar I disorder to major depressive disorder.  (R. at 470.)

**B.      Lee Howard, Ph.D.**

Consulting psychologist, Dr. Howard, examined Plaintiff on March 20, 2000.  (R. at 297-305.)  Plaintiff complained of memory loss, depression, anxiety and previous limited educational achievement.  (R. at 298.)  She denied a history of substance abuse.  (*Id*.)  She reported past employment as a waitress, security guard, and cashier.  Her behavior, mood, affect, orientation, and social presentation were all normal.  (R. at 301.)  Dr. Howard described Plaintiff

as "friendly, cooperative and interactive." (*Id.*) He found no overt evidence of depression or anxiety during the examination. (R. at 301.)

Plaintiff's I.Q. testing revealed a verbal IQ score of 69, a performance IQ score of 74, with a full scale IQ score of 69. (R. at 302.) Dr. Howard noted these scores were invalid because he felt Plaintiff had not given an optimal performance and her behavior did not correlate with mental retardation. (*Id.*) He believed Plaintiff's intelligence level was in the upper-borderline to low-normal range, which was consistent with her functional capacity and clinical presentation. (R. at 304.) Dr. Howard opined that Plaintiff is able to execute a normal daily routine without supervision. He noted that Plaintiff provided ongoing supervision for the three children in the household, attends Bingo and church once per week, performed housework daily, prepared one meal per day, drove three times per week, and bathed/changed clothes every two days. (R. 304.) Dr. Howard diagnosed Plaintiff with dysthmic disorder and mild panic disorder with agoraphobia. (R. at 303.)

Dr. Howard opined that Plaintiff can understand and execute simple instruction but not at the moderate or complex task range. He noted that in the past, Plaintiff had performed in settings including waitress, security guard, and cashier. He pointed out that these positions would also be consistent with the upper borderline to low dull normal range functioning. (R. at 304.) He further opined that Plaintiff would be able to maintain appropriate attention and concentration for simple tasks, but not moderate or complex tasks. (*Id.*)

Dr. Howard also opined that Plaintiff could relate to co-workers, supervisors, or deal with the public in a fairly normal fashion, noting that she related to him without any unusual or aberrant behavior. (R. at 305.) Finally, Dr. Howard opined that Plaintiff could not perform in

11

moderate to high stress positions but could perform in a low stress position.  (R. at 305.)  He explained that he found moderate limitations in this area due to her reported depression, mild panic attacks or mild agoraphobia.  (*Id.*)

## C.    Daniel Hrinko, Psy.D.

On June 20, 2007, consulting psychologist, Dr. Hrinko, evaluated Plaintiff.  (R. at 399-402.)  Plaintiff reported that she was tired and irritable and that she had poor memory and concentration.  She also reported anger problems and getting fired for hitting her boss on several occasions.  She said that she had problems controlling her anger and that she worried about her finances.  She alleged that she had been sexually abused as a child.  Plaintiff admitted to smoking marijuana on a daily basis.  (R. at  401.)  She reported that she had stopped using alcohol 15 years ago.  (*Id.*)  Plaintiff indicated that she spends her days at home completing most household chores and that she fished and played Bingo for recreation.  (*Id.*)  Dr. Hrinko noted that during the examination, Plaintiff exhibited a simplistic speech pattern reflecting her limited education.  (*Id.*)  He found no signs of panic attacks due to anxieties or fears, just that Plaintiff desired to leave situations before she became overwhelmed and aggressive.  (*Id.*)  Dr. Hrinko also found that Plaintiff was alert, oriented, not confused, and had no difficulty with concentration.  (*Id.*)  He diagnosed Plaintiff with bipolar disorder and cannabis abuse.  (R. at 402.)  Dr. Hrinko assigned a GAF score of 40.[3]

---

[3]A GAF score of 40 is indicative of "[s]ome impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood." DSM-IV-TR at 32-34.

Dr. Hrinko opined that due to her psychological factors, her ability to relate with coworkers and supervisors is markedly impaired. (R. at 402.) He further opined that "[s]hould a job be found that was within her physical capabilities, her difficulty in managing moods and impulsivity will contribute to angry outbursts making long-term management of these critical relationships very difficult." (R. at 402.) He found that Plaintiff's ability to understand and to follow instructions, based upon memory skills, is markedly impaired. (*Id*.) He explained that "[s]he is distracted by her moods and feelings, making it difficult for her to learn new or recall preciously learned information for work purposes." (*Id*.) Dr. Hrinko also concluded that Plaitniff's ability to maintain attention, and to perform simple repetitive tasks is moderately impaired. He explained that "[a]s she becomes angry, frustrated, and frightened, she is distracted away from tasks that she may be expected to perform." Finally, Dr. Hrinko opined that Plaintiff's ability to withstand stresses and pressures of employment is markedly impaired. (*Id.*)

**D.    Tonnie Hoyle, Psy.D.**

State agency physician Dr. Hoyle performed a "Psychiatric Review Technique" on July 9, 2007, based upon her review of the medical record. (R. 404-17.) Dr. Hoyle opined that Plaintiff had moderate restrictions in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace. (R. at 414.) Dr. Hoyle also found that Plaintiff experienced one or two episodes of decompensation. (*Id.*) She completed a Mental Residual Functional Capacity Assessment wherein she adopted the ALJ's September 2001

mental RFC finding under the *Drummond* ruling.[4]  (R. at 420.)  Dr. Hoyle concluded that

Plaintiff would be limited to performing simple, repetitive tasks in a low-stress environment with

no production quotas and no interaction with the public.  (*Id.*)  Dr. Cynthia Waggoner, Psy.D.,

reviewed Plaintiff's medical record in January 2008 and affirmed Dr. Hoyle's assessment.  (R. at

464.)

## V.  THE ADMINISTRATIVE DECISION

On March 23, 2010, the ALJ issued his decision.  (R. at 10-22.)  At step one of the

sequential evaluation process,[5] the ALJ concluded that Plaintiff had not performed substantially

---

[4]In  *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), the
United States Court of Appeals for the Sixth Circuit essentially held that absent evidence of an
improvement in a claimant's condition or of changed circumstances, a subsequent ALJ is bound
by the residual functional capacity finding of a previous ALJ.  Following *Drummond*, the Social
Security Administration issued Acquiescence Ruling 98-4(6), instructing adjudicators to apply
*Drummond* to claims within the Sixth Circuit.

[5]Social Security Regulations require ALJs to resolve a disability claim through a five-
step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a
dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:

> 1.  Is the claimant engaged in substantial gainful activity?
> 2.  Does the claimant suffer from one or more severe impairments?
> 3.  Do the claimant's severe impairments, alone or in combination, meet or equal
>     the criteria of an impairment set forth in the Commissioner's Listing of
>     Impairments, 20 C.F.R. Subpart P, Appendix 1?
> 4.  Considering the claimant's residual functional capacity, can the claimant
>     perform his or her past relevant work?
> 5.  Considering the claimant's age, education, past work experience, and
>     residual functional capacity, can the claimant perform other work available
>     in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *accord Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

gainful activity since March 1, 2006.  He found that Plaintiff had the following severe

impairments: intermittent back pain and history of shingles; anxiety and depression with a

history of a bipolar disorder; and borderline intellectual functioning with a history of a reading

disorder.  (R. at 14.)  He further found that Plaintiff did not have an impairment or combination

of impairments that met or medically equaled one of the listed impairments.  (R. at 16.)  At step

four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity

("RFC").  The ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity (RFC) to perform medium work as
> defined in 20 CFR 404.1567(c) and 416.967(c) featuring: 1) no climbing of ropes,
> ladders, or scaffolds; 2) no exposure to irritants; 3) low stress jobs with no
> production quotas; 4) simple one- or two-step tasks requiring little, if any,
> concentration; 5) no complex or detailed instructions; 6) no reading above the
> second-to-third grade level; 7) limited contact with co-workers and supervisors with
> no teamwork; and 8) no direct dealing with the general public.  By definition,
> medium work ordinarily requires the capacity to lift 25 pounds frequently and 50
> pounds occasionally, and to engage in a good deal of sitting, standing, or walking.

(R. at 17.)  From a mental standpoint, the ALJ found no basis for any radical departure from the

mental restrictions set forth in the prior September 2001 hearing decision.  (R. at 18.)  In

reaching this determination, the ALJ explicitly noted the reviewing psychological consultants,

Dr. Hoyle and Dr. Waggoner, argued persuasively for the adoption of the mental RFC

determined within the previous the September 2001 hearing decision.  (*Id.*)  The ALJ gave little

weight to the opinions of Mr. Foltys, Mr. Schweikert, and Dr. Hrinko.  (R. at 19-20.)  He

concluded that although Plaintiff's impairments could reasonably be expected to cause some of

her alleged symptoms, her statements were not credible concerning the intensity, persistence,

and limiting effect of her symptoms were not credible the extent they were inconsistent with the

RFC he assigned.  (R. at 21.)

15

Finally, relying on the VE's testimony, the ALJ found that Plaintiff was unable to perform any of her past relevant work, but that she could perform 8,000 medium jobs in the local economy, citing the examples of store laborer, hand packager, and order filler, as well as 5,000 light jobs in the local economy, citing the examples of laundry folder, small parts assembler, and machine tender.  (R. at 21-22.)  He, therefore, concluded that Plaintiff was not disabled.  (R. at 22.)

## VI.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

16

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial

evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the

Commissioner will not be upheld where the SSA fails to follow its own regulations and where

that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"

*Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.

2007)).

## VII.   LEGAL ANALYSIS

Plaintiff advances three arguments in support of her assertion that the Court should

reverse the Commissioner's decision.  First, Plaintiff contends that the ALJ erred in his

consideration and treatment of Plaintiff's treating and examining sources.  Second, Plaintiff

maintains that the ALJ failed to provide a proper hypothetical to the VE.  Finally, Plaintiff

submits that the ALJ incorrectly assessed her credibility.  The undersigned addresses each of

Plaintiff's contentions of error in turn.

## A.    ALJ's Consideration of Plaintiff's Medical Sources.

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as

"statements from physicians . . . that reflect judgments about the nature and severity of your

impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite

impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

17

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889,

2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In this case, within this assertion of error, Plaintiff posits that the ALJ should have accorded controlling weight to the opinions of Dr. Foltys, Mr. Schweikert, Dr. Howard, and Dr. Hrinko. Plaintiff further asserts that ALJ erred in failing to provide any explanation for the weight he afforded Plaintiff's treating physicians. Finally, he maintains that the ALJ simply substituted in his medical opinion for the evidence provided in by the medical sources. The undersigned disagrees.

### 1. Mr. Foltys

The ALJ considered Mr. Folty's opinion that Plaintiff remained disabled due to possible neurocognitive and learning deficits, but gave it "little weight." (R. at 19-20.) She explained as follows:

> [H]is opinion is not supported by reliable objective testing over time. Other evaluations strongly indicate that the claimant is much more functional than proposed by [M]r. Foltys. Consistent evidence of amnestic disorder is not in the record. The claimant may indeed be a poor historian . . . but the inconsistencies in her statements cannot be attributed to her cognitive status. Notably, the claimant was clearly seeking entitlement to Social Security Benefits, and this motivation may have influenced her presentation to [M]r. Foltys. In terms of supportability and consistency with the overall record, the opinion . . . is given rather low marks: his opinion is not given controlling or deferential weight.

(*Id.*)

The undersigned finds no error in the ALJ's treatment of Mr. Foltys' opinion. First, contrary to Plaintiff's assertions, Mr. Foltys is not a treating source. As set forth above, to qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502. A court must determine whether or not an ongoing treatment relationship exists at the time the physician's opinion is rendered. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. Feb. 9, 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*. [V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating physician at the time of the assessment."); *see also Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimaint's] condition."). This is because "the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). In this case, Mr. Foltys had

20

no treatment relationship with Plaintiff, let alone an "ongoing treatment relationship" when he rendered his opinion. Rather, the record reveals that Plaintiff self-referred herself to Mental Health Services for Clark County, Inc., where Mr. Foltys worked, not to obtain treatment, but in an effort to support her application for Social Security Disability. Because Mr. Foltys cannot be considered a treating source, his opinions are not entitled to any particular weight.[6] *See* 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d).

Regardless, the undersigned finds that the ALJ provided good reasons for rejecting Mr. Foltys' opinions and that substantial evidence supports the ALJ's stated reasons. Notably, Mr. Foltys did not diagnose Plaintiff with a mood disorder or opine that she is disabled from stress or anxiety. Indeed, he described her as "cooperative, verbal, and friendly." (R. at 535.) Instead, he premised his opinion on "possible neurocognitive and learning deficits." (*Id.*) In support of these diagnoses, he reported that Plaintiff "was unable to remember a single fact from a small short story," that she could not remember "more than four digits forward," that she did not "know how old she was," that she could not count backwards from twenty to one. (R. at 535-36.) The undersigned concludes that the ALJ reasonably questioned the credibility of Plaintiff's presentation to Mr. Fortys when compared with the inconsistent evidence in the record suggesting that Plaintiff was not so limited. (*See, e.g.*, June 2007 Learning Assessment (R. at 590) (indicating that Plaintiff was able to read and write, understand and follow direction, and

---

[6]Moreover, it appears that Mr. Foltys, identified in the record as a "psychological assistant" (R. at 294, 535), cannot be considered a treating source because the agency's regulations limit treating sources to "acceptable medical sources," the definition of which does not include psychological assistants. *See* 20 C.F.R. §§ 404.1502, 404.1513. Although "[l]icensed or certified psychologists" are included, there is no indication in the record that Mr. Foltys is licensed or certified.

that she had no physical limitations on learning); Dr. Howard's Assessment (R. at 297-305) (finding that Plaintiff can understand and execute simple instructions, noting that she has worked as a waitress, security guard, and cashier; Mr. Schwikert's Assessment (R. at 394-98) (noting that Plaintiff's "memory was intact for immediate, recent, and remote periods" and that her "[t]hought processes were clear"); Pl.'s Hearing Testimony (R. at 55) (representing that she was able to perform her job as a cashier, in part, because she was able to train herself to count change).)  Accordingly, the undersigned finds no error in the ALJ's treatment of Mr. Fortys' opinion.

### 2. Mr. Schweikert

The ALJ considered Mr. Schweikert's opinion that her moderate and marked mental limitations and her "lower level of reading" would render her unemployable and "difficult to place . . . in a job," but assigned it "little weight."  (R. at 20, 392-93.)  In declining to assign Mr. Schweikert's opinion greater weight, the ALJ noted the internal inconsistencies in his opinion, Plaintiff's lack of participation in the recommended counseling and continued abuse of marijuana, and the lack of supportability and consistency of this opinion when compared with the overall record.

Again, the undersigned finds no error in the ALJ's treatment of Mr. Schweikert's opinion.  Mr. Schweikert's opinion, like Mr. Foltys' opinion, is not entitled to any particular weight because he is not a treating source.  There is no evidence that Plaintiff had an ongoing treatment relationship with Mr. Schweikert at the time he rendered his opinion.  Instead, the record reveals that Plaintiff once again referred herself for an examination in connection with her application for Social Security Disability and that Mr. Schweikert noted that she had previously

been assessed by Mr. Fortys, but that she did not follow his treatment recommendations.  (R. at 394.)  Moreover, Mr. Schweikert, a Licensed Independent Chemical Dependency Counselor, cannot be considered a treating source because he is not an "acceptable medical source."  *See* 20 C.F.R. §§ 404.1502,  20 C.F.R. § 404.1513(a); *accord Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (noting that mental health counselors are not acceptable medical sources).

The undersigned further concludes that the ALJ set forth good reasons for rejecting Mr. Schweikert's opinion and that substantial evidence supports his reasons.  It is undisputed that Plaintiff was abusing marijuana on a daily basis when he rendered his opinion.  Although Mr. Schweikert marked boxes on a chart indicating that he found her to be markedly limited in her "ability to remember very short and simple instructions," "remember locations and work-like procedures," and "get along with coworkers and peers," he noted in his assessment of Plaintiff that throughout the interview "her attitude was positive and her behavior was focused,"  "[h]er memory was in tact for immediate, recent, and remote time periods," "[h]er speech . . . [was] within normal ranges," her "[t]hought processes were clear," and "[h]er insight into her problems was adequate."  (R. at 392, 397.)  He also noted that Plaintiff "has an active social life and participate[s] [in] playing Bingo on a weekly basis."  (R. at 394.)  Further, as set forth above, the record evidence does not support Mr. Schweikert's findings of marked deficits in Plaintiff's understanding and memory.  Finally, Mr. Schweikert's conclusion that her limitations, including her lower level of reading, rendered her unemployable or "difficult to place in a job" is essentially a vocational judgment that he is not qualified to make, and therefore, was not entitled to any weight.  *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *cf. West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 696 (6th Cir. 2007) (quoting *Houston v. Sec'y of Health and Human*

*Servs.*, 736 F.2d 365, 367 (6th Cir. 1984) ("'[T]he [ultimate] determination of disability is the prerogative of the [Commissioner], not the treating physician.'").

### 3.    Dr. Howard

Plaintiff declares that the ALJ should have accorded Dr. Howard's report controlling weight, but neglects to elaborate.

As set forth above, Dr. Howard opined that Plaintiff could understand and execute simple instruction but not at the moderate or complex task range; maintain appropriate attention and concentration at the simple task range, but not at the moderate or complex task range; relate to fellow workers, supervisors, and deal with the public in a fairly normal fashion; and could perform in a low stress position.  (R. at 305-05.)

The ALJ considered Dr. Howard's opinion and referenced it with approval.  (*See* R. at 15, 16.)  Indeed, the ALJ's RFC determination accounts for each of the limitations Dr. Howard sets forth in his opinion, even adding more restrictive limitations.  (*See* R. at 17 (including limitations for "simple one- or two-step tasks requiring little, if any, concentration"; "no complex or detailed instructions"; "no reading above the second-to-third grade level"; "limited contact with co-workers and supervisors with no teamwork"; and "no direct dealing with the general public.").)

Accordingly, the ALJ committed no error with regard to his treatment of Dr. Howard's opinion.

### 4.    Dr. Hrinko

Dr. Hrinko, a consulting psychologist, opined that due to psychological factors,  Plaintiff was markedly impaired in her ability to relate with coworkers and supervisors; her ability to

understand and to follow instructions, based upon memory skills; and in her ability to withstand stresses and pressures of employment.  (R. at 402.)  The ALJ considered but rejected Dr. Hrinko's opinion.  (R. at 16-17, 20).  He concluded that Dr. Hrinko's opinion was internally inconsistent and also inconsistent with the record.  (*Id*.)

The undersigned finds no error in the ALJ's treatment of Dr. Hrinko's opinion.  Dr. Hrinko is not entitled to any special deference as he is not a treating source.  Moreover, the ALJ provided good reasons for rejecting his opinions, and those reasons are supported by substantial evidence.  As the ALJ points out, although Dr. Hrinko concluded that Plaintiff was markedly limited socially, other examiners, including Dr. Howard and Mr. Schweikert, found her social limitations to be within normal limits or considered her to have an active social life.  The record further reflects that Plaintiff went boating and fishing, played Bingo on a weekly basis, went to church, sustained a long-term relationship with her boyfriend, and had a friend who visited her and helped her with shopping.  Dr. Hrinko's conclusion that she is markedly impaired in her ability to withstand stress and understand instruction is also inconsistent with substantial evidence in the record.  The ALJ noted that Plaintiff was capable of concentrating sufficiently to drive and pursue her pastime of Bingo.  (R. at 17.)  Dr. Howard, concluded that Plaintiff's ability to understand simple instruction was not impaired, noting that she previously had worked as waitress, security guard, and cashier.  (R. at 304.)  Dr. Howard further noted that Plaintiff demonstrated no overt signs of anxiety during his examination.  (R. at 301.)  Finally, the ALJ points out that even Dr. Hrinko noted that during his examination, Plaintiff was alert, oriented, not confused, and had no difficulty with concentration.  (R. at 17, 401.)

     **5.**     **Residual Functional Capacity Assessment**

Finally, within this assertion of error, Plaintiff makes the conclusory assertion that the ALJ erred in substituting his own opinions.  (Pl.'s Statement of Errors 5, ECF No. 10.)  She fails to develop this argument, but it appears that she is challenging the validity of the ALJ's RFC determination.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

In this case, there is no basis for concluding that the ALJ "played doctor," "interpreted raw medical data," or otherwise made up medical opinions in determining Plaintiff's RFC.  Rather, the undersigned concludes that the ALJ's RFC determination is supported by substantial evidence, namely, the opinions of Drs. Howard, Hoyle, Waggoner, the assessment notes of Messrs. Foltys and Sweikert, Plaintiff's June 2007 educational-learning assessment, and

26

Plaintiff's own testimony.  Accordingly, the undersigned concludes that this assertion of error lacks merit.

**B.      Vocational Expert Hypothetical**

Next, Plaintiff contests the validity of the hypothetical question posed to the VE, which elicited testimony to the effect that Plaintiff retained sufficient residual capacity to perform a significant number of jobs.  "In order for a VE's testimony to constitute substantial evidence that a significant number of jobs exists, the questions must accurately portray a claimant's physical and mental impairments." *Cole*, 661 F.3d at 939; *Anderson v. Comm'r of Soc. Sec.*, No. 09-6370, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the claimant is able to perform a significant number of jobs."); *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) (same).  Here, Plaintiff contends that the ALJ erroneously failed to include the marked limitations that Dr. Hrinko found.

The undersigned finds that the ALJ's hypothetical question incorporated all of the limitations that the ALJ found credible and supported by the evidence and, therefore, was proper. In formulating the hypothetical, an ALJ is only "'required to incorporate those limitations accepted as credible by the finder of fact.'"  *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 438 (6th Cir. 2010) (quoting *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  Here, the ALJ did not find Dr. Hrinko's conclusions about marked limitations in various areas credible.  Thus, he did not err in failing to account for Dr. Hrinko's opinion in his RFC.  Plaintiff fails to identify other evidence supporting additional RFC restrictions that the ALJ found credible.  Accordingly, the ALJ did not err in relying on the VE's testimony.

C.      **Credibility Assessment**

        In Plaintiff' final assignment of error, she submits that the ALJ incorrectly assessed her

credibility.  More specifically, Plaintiff maintains that the ALJ improperly concluded that her

mental impairments are not as severe as she represents.  Again, the undersigned finds no error.

        "The ALJ's assessment of credibility is entitled to great weight and deference, since he

had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue*, 263 F. App'x 469,

475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997));

*Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the

ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in

the evidence, or decide questions of credibility" (citation omitted)).

        Despite this deference, "an ALJ's assessment of a claimant's credibility must be

supported by substantial evidence."  *Walters*, 127 F.3d at 531.  The ALJ's decision on credibility

must be "based on a consideration of the entire record."  *Rogers*, 486 F.3d at 247 (internal

quotation omitted).  "Discounting credibility to a certain degree is appropriate where an ALJ

finds contradictions among the medical reports, claimant's testimony, and other evidence."

*Walters*, 127 F.3d at 531.  Furthermore, in assessing credibility, the ALJ may consider a variety

of factors including "the . . . frequency, and intensity of the symptoms; . . . [and] the type,

dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms . . ."

*Rogers*, 486 F.3d at 247.

        In the instant case, the ALJ analyzed Plaintiff's credibility as follows:

        All relevant credibility factors were taken into account in evaluating the
        claimant's subjective allegations.  Her level of care has been conservative. . . .  She
        has a history of being charged with two DUI's in the past, and of significant
        marijuana use, although she seemed to minimize her substance abuse history at the

28

hearing. Her attendance in mental health therapy was sporadic, and she no longer goes to counseling. She has had no recent inpatient hospital visits of extended duration. The medical records do no corroborate medication side effects that would preclude her from working. Despite her claim that she has been disabled her whole life, she has worked in SGA, and she has drawn unemployment benefits. With respect to her unemployment claims(s), presumably she would have signed a statement indicating her ability to work.

It is difficult to fully trust the claimant's wide-ranging allegations in view of many apparent contradictions in her testimony. She gave inconsistent answers about her activities and functional abilities. Mental Health Service notes reference her motivation to get disability benefits, but she apparently has shown little sustained effort to stay in counseling. She has admitted to falsifying a job application and apparently obtaining a driver's license by the deceit of having a look-a-like friend take the test for her. At the hearing, she displayed no signs of pain or distress. . . . She seemed to be engaging in a great deal of exaggeration. She was not a credible witness.

Therefore, after careful consideration of the evidence, the undersigned finds that the claimant's medically-determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 20-21.)

The undersigned declines disturb the ALJ's credibility determination. In the instant case, the record is replete contradictions in Plaintiff's testimony and examples of her exaggerating her symptoms. For example, at the hearing, Plaintiff contradicted her testimony regarding why she stopped working, first representing that it was due to stress and shingles, then testifying that she quit because she was unable to learn the job, and later acknowledging that she did not quit, but was fired for falsifying her job application. (R. at 39, 40, 53.) She also testified at the hearing that she did not do any type of housework, that she did not go shopping or to the grocery store or to church, that she only has one friend who visits her, that she has no hobbies that she does not participate in any sports, and that she does not take trips. (R. at 48–49.) She represented to Mr.

29

Schweikert, however, that she had "an active social life" and that she played Bingo on a weekly

basis.  (R. at 394.)  He opined that her recreational and leisure activities were adequate.  (R. at

397.)  Similarly, she told Dr. Howard that she attends Bingo and church once per week,

performed housework daily, prepared one meal per day, and drove three times per week.[7]  (R.

304.)  The ALJ did not err in considering these inconsistencies in assessing Plaintiff's

credibility.  *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and

severity of claimant's symptoms).  Nor did he err in considering the numerous other

inconsistencies in the record that she identified.  *See Walters*, 127 F.3d at 531 (discounting

credibility appropriate where ALJ finds contradictions between claimant's testimony and the

record).

In sum, the undersigned finds that the ALJ's assessment of Plaintiff's credibility was

based on consideration of the entire record and is supported by substantial evidence.

Accordingly, applying the applicable deferential standard of review, the undersigned concludes

that the ALJ's credibility determination was not erroneous.

## VIII.  CONCLUSION

From a review of the record as a whole, the undersigned concludes that there is

substantial evidence supporting the ALJ's decision denying benefits.  Accordingly, the

undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's Statement of Errors and

**AFFIRM** the Commissioner of Social Security's decision.

## IX.  PROCEDURE ON OBJECTIONS

---

[7]Her participation in these activities also undermines her credibility with regard to her
testimony that she could not go back to work because she cannot stand to be around people.  (R.
at 48-49.)

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: August 17, 2012                                          /s/ *Elizabeth A. Preston Deavers*
                                                                      Elizabeth A. Preston Deavers
                                                                      United States Magistrate Judge